**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALEXANDER TREFELNER, a minor, | ) | |
| by his parents and natural guardians | ) | |
| SHIRLEY TREFELNER and JOSEPH | ) | |
| TREFELNER, | ) | Honorable Joy Flowers Conti |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 09-1011 |
| | ) | |
| v. | ) | |
| | ) | |
| THE BURRELL SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

On August 25, 2009, the court held a hearing on the motion for temporary restraining order (Doc. No. 2) filed by plaintiffs Alexander Trefelner ("A.T."), Shirley Trefelner, and Joseph Trefelner (referred to collectively as "plaintiffs") and the response thereto (Doc. No. 9) of defendant Burrell School District ("Burrell" or "defendant"). Plaintiffs filed a complaint asserting claims against defendant under § 1983 for violating plaintiffs' rights under the First and Fourteenth Amendments. Plaintiffs seek a temporary restraining order to compel defendant to permit A.T. to participate in certain extracurricular activities offered by defendant. The court granted a temporary restraining order and advised that the reasons for the court's decision, which were detailed on the record, would be set forth in a written opinion.

### *Factual Background*[1]

With respect to extracurricular activities, Burrell adopted Policy No. 122, titled "Co-Curricular Activities," which provides in relevant part:

> Participation in School Activities
>
> A student must be enrolled in Burrell School District in order to participate in curricular, co-curricular or extracurricular activities.

(Defendant's Br. in Opp. (Doc. No. 7), Ex. 3.)  As interpreted by the school district, this policy means that a student must attend the full curricula of classes each day the student is to participate in an extracurricular activity offered by Burrell.  Shannon Wagner, Burrell's superintendent, testified that "enrolled" means that "children that participate in extracurricular activities are to participate in Burrell School District full time, are enrolled [sic]."  (TRO Hr'g Tr. 37.)  Wagner stated that "[t]he board believes that if a child is not enrolled full time in Burrell School District, they are not to participate in the extracurricular activities."  (Id. at 38.)

After the adoption of Burrell's Policy No. 122, Pennsylvania's Public School Code, 24 PA. CONS. STAT. § 1-101 et seq., was amended to permit students who are home schooled or, in certain situations, students who attend charter schools to participate in extracurricular activities offered by the school district in which they reside.  The superintendent testified that "the law regarding home-schooled students and the law regarding cyber students supersedes our policy . . . ."  (TRO Hr'g Tr. 38-39.)  The superintendent was asked that by the court "[n]ow, was [Policy No. 122] adopted prior to the statutory changes for the cyber school and the charter schools?"  The superintendent answered "[y]es."  (Id. at 45.)

In relevant part, section 17-1719-A of the Pennsylvania Public School Code provides:

> Notwithstanding any provision to the contrary, no school district of

---

[1] The factual background was developed on the record on August 25, 2009, and the relevant facts are not in dispute.

> residence shall prohibit a student of a charter school from participating in any extracurricular activity of that school district of residence: Provided, That the student is able to fulfill all of the requirements of participation in such activity and the charter school does not provide the same extracurricular activity.

24 PA. CONS. STAT. § 17-1719-A(14) (enacted June 19, 1997).  Section 13-1327.1 of Public School Code provides, in relevant part:

> (1) Beginning January 1, 2006, the school district of residence shall permit a child who is enrolled in a home education program to participate in any activity that is subject to the provisions of section 511, including, but not limited to, clubs, musical ensembles, athletics and theatrical productions provided that the child:
>
> > (i) Meets the eligibility criteria or their equivalent for participation in the activity that apply to students enrolled in the school district;
> >
> > (ii) Meets the tryout criteria or their equivalent for participation in the activity that apply to students enrolled in the school district; and
> >
> > (iii) Complies with all policies, rules and regulations or their equivalent of the governing organization of the activity.
>
> (4) A board of school directors may adopt a policy to implement the requirements of this subsection. Such policy shall only apply to participation in activities and shall not conflict with any provisions of this section.

24 PA. CONS. STAT. § 13-1327.1(f.1) (enacted November 10, 2005).

Despite the changes in the Public School Code, Policy No. 122 was not changed.  The policy on its face conflicts with the Public School Code, to the extent that the code provides that home-schooled and, in certain situations, charter-schooled individuals must be permitted to participate in extracurricular activities.  These individuals would not be full-time Burrell students or attend classes at Burrell schools for entire school days, and thus, under the policy as written,

would not be permitted to participate.  Burrell, however, will apply Policy No. 122 to be in

accordance with the Public School Code.  Burrell will permit individuals that reside within its

district and are home schooled to participate in its extracurricular activities.  Burrell similarly

will permit individuals that reside within its district and attend charter schools to participate in its

extracurricular activities, provided that the charter school does not offer the activity.  The

superintendent testified:

> Q. Now, if [A.T.] were home-schooled, you would -- there would
> be no problem with him being in the marching band, correct?
>
> A. Yes, because the law requires it.
>
> Q. If he was home-schooled and he were [sic] being home-
> schooled in all of his classes, he would still be permitted to be in
> the marching band?
>
> A. That's because that is what the law says.
>
> Q. Whether concert band or jazz band, he would still be
> participating?
>
> A. That is correct.
>
> Q. That's the same if he attended a cyber school or charter school?
>
> A. That is correct.

(TRO Hr'g Tr. 29.) Burrell, however, continues to apply its policy to students who attend private

schools that are not charter schools.  (Id. at 39-40.)  Such private schools include parochial

schools.

    With respect to the home school and charter school exceptions to the policy, the

superintendent testified:

> Q. . . .  If a charter school student or a home-schooled student
> doesn't come in for the whole day, they are still permitted to
> participate in the marching band, correct?

A. They are required by law to keep a port folio that documents their attendance. They would be required by law, just like any other child, the parent would contact the school and say okay, they attended school these days out of the week and there's their academic progress.

Q. What would stop you from having [A.T.] document ["]I was at St. Joe's today and I'm now at class["] because this policy, am I not correct, is to make sure the kids go to school?

A. As long as they are fully enrolled in Burrell School District.

Q. Unless they are home-schooled, they would have the parents write a letter and say he went to class today?

A. That's a home-schooled child.

Q. A charter school, he looks at the computer all day or cyber?

A. The school official would report.

Q. What's to stop the principal of St. Joe's from sending over an email indicating [A.T.] was in school today?

A. Again, the board interprets it as something different.

(TRO Hr'g Tr. 44-45.)

The superintendent testified that the purpose of Policy No. 122 is as follows:

THE COURT: And would you say for a student who is in cyber school or being home-schooled, their ability to participate in these curricular or extracurricular activities undercuts or undermines the policy as it was enforced before those statutes?

THE WITNESS: Correct, but we have to follow the law.

THE COURT: I understand.

THE WITNESS: The board does.

THE COURT: What is the purpose behind this policy, do you know?

THE WITNESS: I believe the purpose of extracurricular activities is to make a well-rounded child.

> When they develop any kind of policy like this, the board of directors would be discussing the children that are within their rights, to give them a well-rounded opportunity, and the students who choose to go to private school choose to take themselves out of the public realm.
>
> So it's their philosophy these activities are for the students who are within the doors of Burrell School District.
>
> THE COURT: But that policy is undermined by the cyber school and the home-schooled because they're not within the confines of the educational environment that is actually being provided on-site as a full-time student?
>
> THE WITNESS: That's correct.

(Id. at 45-47.)

Sandra Becker, defendant's musical teacher and band director, testified:

> THE COURT: It's the Court's understanding that under the new state law, that a school cannot require attendance at a district in order for a charter student who -- which would include the cyber schools, who does not have an offering, say, for the marching band or a home-schooled student, they would not be required to take any specified curriculum in order to try out for the extracurricular activities.
>
> If that were the case, would you[r] being required to permit those kind of students to try out undermine the policies and the purposes that you just discussed for having students be on-site daily and participating in your curriculum?
>
> THE WITNESS: It would undermine the integrity of the program, yes.

(Id. at 58.)

A.T. attended Burrell schools during the past five years.  During the 2008-2009 school year, as an eighth-grade student, A.T. participated in Burrell's high school marching band.  For the 2009-2010 school year, plaintiffs enrolled A.T. at St. Joseph's Catholic School ("St. Joseph's"), which does not have a marching or jazz band.  A.T. wishes to participate in Burrell's

high school marching band and jazz band during the school year.  Citing its policy, Burrell refused to accommodate plaintiffs' request that A.T. participate in the bands.  Burrell's high school principal stated in a July 28, 2009 e-mail that: "[Burrell School District] permit[s] homeschooled and cyber schooled children to participate [in the marching and jazz bands]. . . . [T]he district will not permit parochial students to participate."  (Compl., Ex. 2.)

Burrell's marching band has approximately 80 members, and there is no regulation on the number of people that can participate in the band.  (TRO Hr'g Tr. 29-30.)  If A.T. is allowed to participate in the marching band, he would not displace a full-time enrolled student, but he might occupy a chair that would otherwise be occupied by a full-time enrolled student.  (Id. at 30-31.) The financial impact of his participation is minimal.  The superintendent testified:

> Q. There's no undue financial cost, correct?
>
> A. At this point, no, because we haven't engaged in the school year.
>
> Q. Sure, having him sit on the band bus going to a football game is not going to cost you anything more, correct?
>
> A. Correct.
>
> Q. He buys his own instrument?
>
> A. Yeah, I believe so.
>
> Q. Well, why is allowing one student like [A.T.] to play in your band -- let me ask you. He played in the band over the last couple weeks, right?
>
> A. Yes.
>
> Q. Was the district hurt by that in any way?
>
> A. No.
>
> Q. Was the district in any way burdened by that?

A. No.

. . .

Q. So how is the district harmed -- how would the district be harmed if the Court were to grant preliminary injunctive relief while this case went through the litigation process?  What would happen -- it wouldn't be financial, correct?  Answer my question. Would it be financial?

A. No.

(Id. at 32-33.)  The superintendent was asked "[h]ave you had anybody else that may have been private students that went out and filed a case or tried to get into the band or any kind of extracurricular activities in the last month or two?"  The superintendent answered "[n]o."  (Id. at 34.)

On August 4, 2009, plaintiffs filed a complaint against Burrell, claiming that defendant denied plaintiffs their free exercise and equal protection rights under the Constitution in violation of 42 U.S.C. § 1983.  (Doc. No. 1.)  Specifically, plaintiffs allege defendant's refusal to permit A.T. to participate in the high school marching and jazz bands was because his parents elected to enroll him in a religious school.  Plaintiffs further allege that the refusal to permit A.T.'s participation, while permitting other students not enrolled in Burrell's schools to participate, deprived plaintiffs of equal protection of the laws.  On that same date, plaintiffs filed a motion for temporary restraining order and/or preliminary injunction.  (Doc. No. 2.)

***Standard of Review***

If there is a possibility that irreparable injury will occur before the hearing on a preliminary injunction required by Rule 65(a) can be held, a temporary restraining order may be available under Rule 65(b).  See FED. R. CIV. P. 65(b).  Injunctive relief in any form is "an

extraordinary remedy that should be granted in 'limited circumstances.'" Messner v. Bunner, No. 07-112, 2009 WL 1406986, at *2 (W.D. Pa. May 19, 2009) (quoting AT & T v. Winback and Conserve Prog. Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)). The standard used to evaluate whether the issuance of a temporary restraining order is warranted is the same as that used to evaluate whether the issuance of a preliminary injunction is appropriate. Messner, 2009 WL 1406986, at *2. The court considers four factors in determining whether to grant a preliminary injunction. A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief. Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). A balancing test is utilized to determine whether there is an overall need for injunctive relief. See Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir. 1975) (stating that while the moving party generally must make a showing with regard to the first two prongs, the court is to weigh all relevant facts with regard to the four factors).

## Discussion

The court will address each of the four factors in determining whether a temporary restraining order should issue.

### A. Likelihood of Success on the Merits

To find that plaintiffs are likely to prevail on the merits, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a [p]rima facie case showing a reasonable probability that it

will prevail on the merits." Oburn v. Shapp, 521 F.2d at 148.  Plaintiffs' claims are brought under the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

### 1. Equal Protection – General Framework

Although plaintiffs raise an equal protection claim, there is significant overlap between their equal protection claim and free exercise claim.  The Equal Protection Clause provides "no . . . state shall deny any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV § 1.  Under the Equal Protection Clause, all persons are not entitled to be treated identically; rather the concept of equal protection stands for the principle that "all persons similarly situated should be treated alike."  Artway v. Attorney General of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class."  Shoemaker v. City of Lock Haven, 906 F. Supp. 230, 238 (M.D. Pa. 1995) (quoting Henry v. Metro. Sewer Dist., 922 F.2d 332, 341 (6th Cir. 1990)); see Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 423 (3d Cir. 2000).  Protected classes include those based upon suspect distinctions, such as race, religion, and alienage, and those impacting fundamental rights.  Artway, 81 F.3d at 1267.  "[A] classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose."  Central State Univ. v. Am. Ass' n of Univ. Professors, 526 U.S. 124, 127-28 (1999) (quoting Heller v. Doe, 509 U.S. 312, 319-21 (1993)).  The free exercise of religion is a fundamental right guaranteed by the First Amendment, and defendant cannot treat individuals

differently on the basis of the exercise of this right.  See Brown v. Borough of Mahaffey, 35 F.3d 846, 850 (3d Cir. 1994).

Plaintiffs' free exercise and equal protection claims "are functionally identical and it would be redundant to treat them separately."  Hill v. City of Scranton, 411 F.3d 118, 126 (3d Cir. 2005).

> It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights.  Laws which classify persons in their exercise of these rights will have to meet strict tests for constitutionality without need to resort to the equal protection clause.  Should the laws survive substantive review under the specific guarantees they are also likely to be upheld under an equal protection analysis, for they have already been found to represent the promotion of government values which override the individual interest in exercising the specific right.

3 RONALD ROTUNDA & JOHN NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 18.40, at 796 (3d ed. 1999); see Hill, 411 F.3d at 126.  Here, the Free Exercise Clause of the First Amendment is the strongest guarantee of the rights at issue in this case.  Accordingly, the court will only address plaintiffs' claims under the Free Exercise Clause.

**2. Free Exercise – General Framework**

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. CONST. amend. I.  If a law is "neutral" and "generally applicable" with respect to religion, that law need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious belief or practice.  Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 879 (1990).  A law that is not neutral or not generally applicable, however, must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

### a. Neutral and General Applicability

A "neutral" law "does not target religiously motivated conduct either on its face or as applied in practice." Blackhawk v. Pennsylvania, 381 F.3d 202, 209 (3d Cir. 2004).  A law is not "generally applicable" if it "burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated."  Id.  "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied."  Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993).

The first Supreme Court decision which recognized the neutral and general applicability test was Smith, decided in 1990; the "legal landscape" with respect to the Free Exercise Clause "changed dramatically" in the wake of this decision.  Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 362 (3d Cir. 1999).  In Smith, Oregon denied two individuals unemployment compensation benefits after they were terminated for ingesting peyote at a ceremony of the Native American Church.  Oregon law prohibited the knowing or intentional possession of a controlled substance, unless the substance was prescribed by a medical practitioner.  Smith, 494 U.S. at 874.  Peyote was a controlled substance under the law. Id.  The basis for the decision to deny unemployment benefits was the individual's use of peyote in violation of the criminal law, and the Supreme Court analyzed the constitutionality of that law in light of the Free Exercise Clause.  The Supreme Court concluded that the law was neutral and generally applicable, and did not infringe the plaintiffs' First Amendment rights.  Id. at 890.

The Supreme Court decided Lukumi in 1993.  In Lukumi, a church that practiced the Santeria religion brought an action challenging ordinances of the city of Hialeah, Florida, which

prohibited the ownership or possession of animals intended to be ritually slaughtered.  Id. at 524-29.  The ordinances specifically permitted, through an exemption, the slaughter of animals for the purpose of food consumption.  Violations of the ordinances were punishable by fines not exceeding $500 or imprisonment not exceeding 60 days, or both.  Id.  The church alleged that the ordinances violated the Free Exercise Clause.  Id.

In analyzing whether the ordinances were facially neutral, the Supreme Court delved beyond their text, noting the "Free Exercise Clause protects against government hostility which is masked, as well as overt.  'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.'"  Id. at 534 (quoting Walz v. Tax Comm'n of New York City, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)).  In its analysis, the Supreme Court focused on the ordinances' usage of the words "ritual" and "sacrifice," city council's references to the religion during a meeting, and the passage of a resolution concurrent to the passage of one of the ordinances that raised a concern over "certain religions."  Lukumi, 508 U.S. at 535-42.  The Supreme Court concluded the ordinances were not neutral.  Id. at 542.

In determining the whether the ordinances were of general applicability, the Supreme Court stated "[a]ll laws are selective to some extent, but *categories of selection* are of paramount concern when a law has the *incidental effect* of burdening a religious practice."  Id. (emphasis added).  The Supreme Court considered the two interests the ordinances allegedly advanced: protection of public health and prevention of cruelty to animals.  The ordinances failed to reach conduct that endangered these interests in a similar degree to that of the Santeria religion.  Id. at 542-45.

13

Since the ordinances were neither neutral nor generally applicable, they were subject to strict scrutiny.  "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests."  Id. at 546 (quoting McDaniel v. Paty, 435 U.S. 618, 628 (1978)).  The Supreme Court held that the city could not make the requisite showing.  Lukumi, 508 U.S. at 546-47.

In 1999, the Court of Appeals for the Third Circuit decided Fraternal Order of Police.  In Fraternal Order of Police, the court of appeals considered a policy of the Newark Police Department, which prohibited its employees from wearing beards.  The policy was implemented by an order issued in 1971.  The order included an exemption from the policy for undercover police officers.  An exception from the policy was later created for those officers that needed to grow beards for medical purposes.  Two Sunni Muslim officers, whose religion mandates the wearing of a beard, filed a complaint.  The officers alleged that policy violated their rights under the Free Exercise Clause.  Id. at 360-61.  The Court of Appeals for the Third Circuit rejected the argument that the First Amendment jurisprudence only applied to criminal statutes.  Id. at 363-64.  The court of appeals discussed whether the beard policy should be subject to strict scrutiny.  The officers argued that the policy was not neutral and not generally applicable, because it provided exemptions for medical reasons but not religious reasons.  The officers asserted that the department deemed religious reasons "of lesser import."  Id. at 365.  The department responded that the distinction between medical and religious reasons was not a value judgment, because the department was mandated to permit the medical exemption by the Americans with Disabilities Act, 42 U.S.C. § 12101.  Id. at 365.

The court of appeals rejected the argument that strict scrutiny should not apply on the basis that the medical exemption was not an "individualized exemption" or was not an exercise of individualized discretion.   The Court of Appeals for the Third Circuit stated:

> [T]he [Supreme] Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations.  If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a *categorical exemption for individuals with a secular objection but not for individuals with a religious objection.*

Id. (emphasis added).  The court of appeals concluded that the department's decision to permit medical exemptions but not religious exemptions was suggestive of discriminatory intent and triggered heightened scrutiny.  Id.

The department likened their beard policy to the law in Smith, which prohibited the possession of a controlled substance unless prescribed by a medical practitioner, but the Court of Appeals for the Third Circuit disagreed.  The court of appeals noted that the medical exception in Smith did not undermine the law's stated purpose of limiting the use of dangerous drugs.  The court of appeals stated "the Free Exercise Clause does not require the government to apply its laws to activities that it does not have an interest in preventing," and since the purpose was only to limit dangerous uses of drugs, the medical exception was consistent with the purpose of the law.  Id. at 366.  In Fraternal Order of Police, the Court of Appeals for the Third Circuit concluded that the department's exception for undercover police officers did not undermine the beard policy's stated purpose – uniformity – because undercover officers do not hold themselves out to the public as police officers.  The problem, however, was with the medical exception.  The department's medical exception undermined the beard policy's interest in uniformity.  The court of appeals noted that "the medical exemption raises concern because it indicates that the

Department has made a value judgment that secular (i.e., medical) motivations for wearing a

beard are important enough to overcome its general interest in uniformity but that religious

motivations are not." Id.  The court of appeals finally concluded that, although uniformity and

associated interests were compelling, the beard policy was not narrowly tailored to serve those

interests.  Id. at 366-67.

        In 2004, the Court of Appeals for the Third Circuit decided Blackhawk.  At issue in

Blackhawk was a permit fee provision of the Pennsylvania Game and Wildlife Code.  The

plaintiff, a member of several Native American tribes, owned two bears that he used in

performing religious ceremonies.  The Game and Wildlife Code required a permit for wild

animals to be kept by an individual.  A fee ranging from $25 to $300 had to be paid for the

permit.  The fee could be waived by the Director of the Game Commission "where hardship or

extraordinary circumstance warrants"; zoos and "[n]ationally recognized circus[es]" were also

excluded from the permit and fee requirement.  Blackhawk, 381 F.3d at 205.  The plaintiff

requested exemptions in 1998 and 1999 from the fee on the basis that he possessed the bears for

religious purposes, but his requests were rejected.  Id. at 205-06.

        The court of appeals determined that the fee requirement failed the general applicability

requirement for two reasons.  The first problem was the authority bestowed upon the Director of

the Game Commission to make individualized, discretionary exemptions.  A person may have

qualified for one of these discretionary exemptions if the conduct engaged in was not religiously

motivated.  The second problem was the categorical exemptions in the Game and Wildlife Code

for zoos and circuses.  Pennsylvania argued that the fee requirement served two main interests:

(1) generating revenue and (2) discouraging the keeping of wild animals in captivity, which, in

Pennsylvania's stated opinion, was undesirable unless there was a tangible benefit for the state's

wildlife.  The exemption for zoos and circuses, however, undermined these interests to the same

extent as the exemption the plaintiff sought.   The interest in raising money is undermined by any

exemption, and Pennsylvania failed to show how zoos or circuses provided tangible benefits to

Pennsylvania wildlife.  The court of appeals concluded that the fee provisions were substantially

under-inclusive with respect to the asserted goals, and therefore were not generally applicable.

Id. at 210-11.

Pennsylvania additionally raised the argument that the fee provision did not infringe the

plaintiff's free exercise rights, because it did not prohibit him from engaging in religiously

motivated conduct.  It merely required him to pay a small fee.  The Court of Appeals for the

Third Circuit rejected this argument, stating that it "ignore[s] the content of the statutes that are

before us."  Id. at 212.  If a statute is both neutral and generally applicable, it is subject to strict

scrutiny only if it is a substantial burden on religiously motivated conduct.  If not neutral or not

generally applicable, however, the statute is subject to strict scrutiny regardless of the degree of

the burden on religious conduct and regardless whether the impact on religious behavior is

incidental.  The court of appeals explained:

> We are not presented here with a neutral and generally applicable
> user fee that is uniformly imposed without allowing individualized
> exemptions. . . .  Here, by contrast, we are confronted with a
> scheme that features both individualized and categorical secular
> exemptions and it is these that trigger strict scrutiny.

Id.  The court concluded that the Game and Wildlife Code's fee provision was not narrowly

tailored to advance a compelling governmental interest.  Id. at 213-14.

Given this case law, this court concludes that Policy No. 122, as applied, is not generally

applicable.  The situation is similar to Fraternal Order of Police.  The original policy in that case,

as set forth in 1971, was likely both facially neutral and generally applicable.  At that time, the

only exemption was for undercover police officers, and that exemption was consistent with the policy's stated goal of fostering uniformity.  The Americans with Disabilities Act, however, was enacted July 26, 1990.  42 U.S.C. § 12101.  Subsequent to the enactment of the act, an exception to the policy was created for those officers needing to grow beards for medical reasons.  The exception was necessary in order for the policy to comply with federal law.  This exception, however, defeated the general applicability of the policy, because it went against the policy's goal in fostering uniformity.  It was a categorical exemption for a secular reason, and it undermined the policy's stated purpose.  The department refused to permit a categorical exemption for those officers who wanted to wear beards for religious reasons, which would have similarly undermined the policy's purpose.  In essence, the department valued secular exemptions of greater importance than religious exemptions, since both undermined the policy's goal, but one was permitted and the other was not.

Here, Burrell's policy with respect to extracurricular activities, when originally adopted, was facially neutral and generally applicable – it applied to all students who were not enrolled full-time in defendant's schools.  Exceptions to the policy, however, were made as the Pennsylvania Public School Code mandated exceptions for ostensibly secular purposes, i.e. home schooled children and students attending charter schools.  These exemptions undermined Burrell's policy to the same extent that permitting A.T. to participate in the marching band would undermine the policy.  If the state-mandated exceptions were not made, then the policy would violate state law, just like the beard policy in <u>Fraternal Order of Police</u> would have arguably violated the Americans with Disabilities Act if no exception was made for medical reasons.  The exceptions in this case provide secular categorical exemptions from the policy; there is no religious categorical exemption.

18

The secular categorical exemption is constitutional if it is consistent with the interests advanced by the policy.  If not, then it would demonstrate that defendant values secular motivations more than religious motivations.  Burrell stated that purpose behind the policy was to provide its students with a well-rounded education, and to not to provide similar opportunities to those students who choose to take themselves out of the public realm.  The exceptions for charter school and home school students undermine this policy to the extent those exceptions provide for participation in extracurricular activities by non-enrolled students.  Those exceptions also undermine the musical director's interest in on-site classroom participation.  To the extent that the purpose of the policy is to keep track of and have control over the students participating in extracurricular activities, that purpose is undermined by any exception to the policy for students who are not enrolled on a full-time basis.

If the goal of the home school and charter school exemptions is to afford opportunities otherwise unavailable to students receiving education in those forms, then those exemptions are under-inclusive with respect to the asserted goals.  Students attending some private schools, such as St. Joseph's, likewise do not have the opportunity to participate in a marching band or jazz band.  Just as the fee provision in <u>Blackhawk</u> was "substantially 'underinclusive' with respect to its asserted goals, and [it] thus fail[ed] the requirement of general applicability," Policy No. 122 is under-inclusive and, for similar reasons, is not generally applicable.  <u>Blackhawk</u>, 381 F.3d at 211.

Defendant argues that this situation is distinguishable from <u>Fraternal Order of Police</u> and <u>Blackhawk</u>, because while the policy may inflict a burden on A.T.'s choice between religious education and secular education, the policy does not directly affect plaintiffs' practice of religion.  The Supreme Court has recognized a "distinction between the *absolute constitutional*

19

*protection* against governmental regulation of *religious beliefs* on the one hand, and the *qualified protection* against the regulation of *religiously motivated conduct*, on the other." Employment Div., Dept. of Human Resources of Ore. v. Smith, 485 U.S. 660, 680 n.13 (1988) (emphasis added). Plaintiffs' decision to send A.T. to a religious school was motivated by their religious beliefs. Religiously motivated conduct, in certain circumstances, is protected by the Free Exercise Clause of the First Amendment. See Wisconsin v. Yoder, 406 U.S. 205, 219-20 (1972) (*rejecting* the state's argument that, while religious beliefs are free from state control, religiously grounded actions, including the withdrawal of children from public school, are not afforded a level of protection). A state can regulate or even prohibit certain types of religiously motivated conduct, provided the regulation is neutral and generally applicable. On the other hand, if a state law is not neutral or not generally applicable with respect to religiously motivated actions, then, as explained above, it is subject to heightened scrutiny regardless whether the burden on those actions is slight or incidental. See Smith, 494 U.S. at 877-82; see also Lukumi, 508 U.S. at 542-43.

Here, plaintiffs' action of enrolling A.T. in a parochial school was religiously motivated and would be afforded protection under the Smith framework. In Combs v. Homer-Center Sch. Dist., 540 F.3d 231, 241-43 (3d Cir. 2008), parents who home-schooled their children for religious reasons challenged a state law that imposed reporting requirements and mandated the teaching of certain subjects. The Court of Appeals for the Third Circuit never questioned whether the decision to home-school the children was religiously motivated, and analyzed whether the law was neutral and generally applicable. The court of appeals stated:

> [the law imposing the requirements] is a neutral law of general applicability. It neither targets religious practice nor selectively imposes burdens on religiously motivated conduct. Instead, it imposes the same requirements on parents who home-school for

> secular reasons as on parents who do so for religious reasons.
> Furthermore, nothing in the record suggests [state] school officials
> discriminate against religiously motivated home education
> programs (e.g., denying approval of home education programs
> because they include faith-based curriculum materials).

Id. at 242.  This court sees no reason to distinguish between "religiously motivated home

education programs" and other forms of religiously motivated education programs, such as

attending a parochial school; if the decision to enroll a student in an education program is

motivated by religion, then that action is protected by the Free Exercise Clause when the action

is burdened by a law that is not neutral or not generally applicable.

The court finds that at this stage plaintiffs have met their burden of "making a [p]rima

facie case showing a reasonable probability that it will prevail on the merits" with respect to the

issue whether the policy is neutral and generally applicable.  Oburn, 521 F.2d at 148.  The policy

will therefore be subject to heightened scrutiny.

### b. Narrowly Tailored to Advance a Compelling State Interest

Under the strict scrutiny standard, a law "must serve a compelling government interest

and must be narrowly tailored to serve that interest."  Blackhawk, 381 F.3d at 209.  Plaintiffs

argue that defendant does not offer any compelling interests justifying its decision.

Again, defendant did not articulate any compelling reasons for the policy that it advances.

Any interest in regulating the students who participate in the extracurricular activities, even

assuming such an interest is of great importance, is undermined by any exemption permitting any

student who is not enrolled full-time to participate.  Since such an interest is undermined by the

charter school and home school exemptions, the policy is not narrowly tailored to advance that

interest.  The policy is also not narrowly tailored to accomplish the goal of affording

opportunities unavailable to home-schooled and charter-schooled children, because comparable

opportunities are also not available to children attending other types of private schools.  A policy is not narrowly tailored if it is under-inclusive.  See id. at 214.  Defendant's policy therefore does not pass muster when subjected to strict scrutiny.

Since, at this stage, plaintiffs have demonstrated a reasonable probability that they will succeed on the merits of their argument that Policy No. 122 is not both neutral and generally applicable, and because plaintiffs have shown a reasonable probability that they will prevail on the merits with respect to the issue whether the policy is narrowly tailored to advance a compelling interest, the first factor for injunctive relief weighs in plaintiffs' favor.

**B. Irreparable Harm if Injunctive Relief is Denied**

Irreparable harm means that the moving party will be injured in such a way that adequate compensatory or other corrective relief will not be available at a later date in the ordinary course of litigation.  Oburn, 521 F.2d at 151.  The court finds that there would be irreparable harm to plaintiffs if the court fails to grant a temporary restraining order, because plaintiffs' free exercise rights under the First Amendment would be infringed if injunctive relief is not granted.  As a general rule, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE § 2948.1 at 161 (2d ed. 1995); see McCormick v. Hirsch, 460 F. Supp. 1337 (M.D. Pa. 1978).  The Supreme Court has recognized that violations of First Amendment rights are irreparable injuries.  See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); Nebraska Press Ass'n v. Stuart, 423 U.S. 1327,

1329 (1975) ("any First Amendment infringement that occurs with each passing day is irreparable").

**C. Injunctive Relief Will Not Result in Greater Harm to the Nonmoving Party**

With regard to the extent to which the nonmoving party will suffer irreparable harm, the court finds that the granting of the temporary restraining order will have at best a minor impact on defendant. All students who try out for defendant's high school marching band are able to participate; defendant does not limit the number of students who can be in the band. Although A.T. might occupy a "chair" that would have otherwise been awarded to a full-time enrolled student, that student will have the opportunity to participate in the band. The court does not think this harm outweighs the harm suffered by plaintiffs as the result of the deprivation of a constitutional right. Plaintiffs provide A.T.'s instrument. There is no discernible financial impact upon defendant if the temporary restraining order is granted.

Defendant's argument that this order will open the floodgates and result in a large number of students that it will have to accommodate is speculation. Burrell asserts that this temporary restraining order will adversely impact various other extracurricular activities, and the circumstances of those activities might implicate problems that are not implicated with the marching band.[2] For example, the number of participants in those other activities might be

_____

[2] The band director testified:

> Q. Did he take -- you're always asking for lots of people to be in your band, as many as you can get, right?
>
> A. I wouldn't say that. Numbers have never been an issue. It's always been quality.
>
> Q. So [A.T.] isn't taking another student's chair or taking another student's place in the band by his playing, correct?

limited, forcing defendant to make cuts.  The temporary restraining order only applies, however, to those extracurricular activities offered by Burrell that are not offered by St. Joseph's; St. Joseph's does not have marching and jazz bands.  Defendant did not present any evidence to the court with respect to whether other extracurricular activities are offered by the private schools attended by students residing in Burrell's geographical area.  Since the only evidence of record is that this temporary restraining order will affect defendant's marching and jazz bands, and because the effect on those activities is limited, the harm to defendant does not outweigh the harm to plaintiffs.

## D. Public Interest Favors Injunctive Relief

With regard to the public interest prong, the court finds that granting the temporary restraining order is in the public interest.  The focus of this prong is "whether there are policy

---

A. Students are seated according to experience level and ability and he wouldn't be taking -- he might be taking a spot that another student would be in if somebody of greater experience level would be there.

Q. He might be -- he might take a first chair but that person would still be allowed in the band, they just might not be first chair. They would be second, third, or fourth?

A. Yes.

Q. But no one is going to be kicked out of the band if [A.T.] is in the band?

A. If you're talking the marching band. The jazz band has been mentioned. There are specific spots in the jazz band.

Q. The marching band, [A.T.]'s presence in the marching band, no student is going to be not allowed in the band because of [A.T.] there, correct?

A. Correct.

(TRO Hr'g Tr. 51-52.)  Defendant's jazz band may raise more significant concerns than those involving the marching band, because the jazz band has "specific spots."  Although the concerns with respect to the jazz band appear to be more significant than those with respect to the marching band, the court does not find that these concerns outweigh the harm to plaintiffs.  As the early analysis demonstrates, plaintiffs' First Amendment rights would be violated if A.T. is not afforded the opportunity to participate in the jazz band, and that injury under the law is irreparable.  A.T. would not be entitled to a "spot" in the jazz band unless he is qualified.  The injury to defendant is small, since quality is a particular issue with defendant's bands.

considerations that bear on whether the order should issue." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE § 2948.4 at 200-01 (2d ed. 1995). There is a strong public interest in protecting fundamental First Amendment rights. Latour v. Riverside Beaver Sch. Dist., No. Civ.A. 05-1076, 2005 WL 2106562, at *3 (W.D. Pa. Aug. 24, 2005). For the reasons already explained, the court believes there is a reasonable probability that plaintiffs will be deprived of their free exercise rights. Any harm to other students is minimal, as already discussed; all students who sign-up for the marching band are able to participate. Enrolled students will have the same opportunity as A.T. to participate in the jazz band. Despite arguing that this temporary restraining order will impact other extracurricular activities, defendant did not present evidence to demonstrate that other activities will be adversely affected. Defendant likewise did not present evidence to support the argument that this order will have a significant financial impact or affect local taxes. In sum, the public interest factors weigh in favor of granting the temporary restraining order.

Upon viewing all four relevant factors together, the court finds that a temporary restraining order is warranted in this case. Plaintiffs have shown a reasonable probability of succeeding on the merits of their claim, plaintiffs will suffer irreparable harm in the absence of injunctive relief, the harm suffered by defendant does not outweigh the harm to plaintiffs, and the granting of the temporary restraining order is in the public interest.

**E. Duration of the Temporary Restraining Order**

Rule 65(b) of the Federal Rules of Civil Procedure allows for entry of temporary restraining orders even without notice to the adverse party, but mandates that such orders that are

issued without notice shall expire within ten days unless it is extended for good cause or by

extension.

> The order expires at the time after entry – not to exceed 10 days –
> that the court sets, unless before that time the court, for good
> cause, extends it for a like period or the adverse party consents to a
> longer extension.  The reasons for an extension must be entered in
> the record.

FED. R. CIV. P. 65(b)(2).  The court believes there is good cause for an extension in this situation,

since the parties need the opportunity to conduct discovery to present necessary evidence at a

preliminary injunction hearing.  See Ctr. for Wound Healing v. Toomey, No. 09-3149, 2009 WL

2246102, at *3 (E.D. Pa. July 24, 2009).

Courts have determined that temporary restraining orders, even when entered with notice

to the adverse party cannot be continued indefinitely, and have indicated that temporary

restraining orders cannot be extended beyond the amount of time set forth in Rule 65(b) without

being treated as the equivalent of a preliminary injunction:

> A temporary restraining order can inflict substantial injury on a
> defendant whether or not it had an opportunity to oppose its entry.
> In recognition of this fact, courts have held that temporary
> restraining orders, even when entered with notice, cannot be
> continued indefinitely without observance of the safeguards
> required for entry of a preliminary injunction and that temporary
> restraining orders of indefinite duration, whether or not issued with
> notice, are subject to appellate review. The most prevalent view is
> that a temporary restraining order, even if issued with notice,
> cannot be continued beyond the periods prescribed in Fed. R. Civ.
> P. 65(b) without being treated as the equivalent of a preliminary
> injunction and thus subject to appellate review.

Nutrasweet Co. v. Vit-Mar Enters., Inc., 112 F.3d 689, 692 (3d Cir. 1997).  Although in ordinary

situations the temporary restraining order cannot extend beyond twenty days without being

automatically converted into a preliminary injunction, an extension is reasonable in other

situations.

The text of Rule 65(b) seems to exclude any possibility that a temporary restraining order can remain in force beyond twenty days. . . .

Although the explicit wording of Rule 65(b) seems to reject any contention that a temporary restraining order can continue beyond [the twenty days] permitted by the rule, the history and purpose of temporary restraining orders support the argument that there may be situations in which a temporary restraining order may remain in effect beyond a total of twenty days.  The first federal statute that explicitly provided for temporary restraining orders, enacted in 1872, stated:

> Whenever notice is given of a motion for an injunction out of a circuit or district court, the court or judge thereof may, if there appears to be danger of irreparable injury from delay, grant an order restraining the act sought to be enjoined until the decision upon the motion; and such order may be granted with or without security, in the discretion of the court or judge.

This language seems to indicate that the temporary restraining order was designed as a device to enjoin further activity by defendant until a hearing could be held on a preliminary injunction and that its duration was to be determined in light of that objective.

The most common situation in which a temporary restraining order is issued for an indefinite period of time or "until the court further orders" is when the order is issued "pending a hearing on the motion for a preliminary injunction."

11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE § 2953, at 279, 281-82 (2d ed. 1995).  Since discovery is needed before the court will decide the motion for preliminary injunction, the temporary restraining order will remain in effect until the hearing on the preliminary injunction, which is scheduled for November 17, 2009 at 4:30 p.m.  See United States v. City of Asbury Park, 340 F. Supp. 555, 557 n.3 (D.N.J. 1972) (noting that "it was not possible to adhere to the twenty-day limitation for temporary restraining orders which is permitted by Fed. R. Civ. P. 65(b)" because of complex evidentiary issues).

Dated:  September 2, 2009                          /s/ Joy Flowers Conti
                                                 Joy Flowers Conti
                                                 United States District Court Judge